## Isham Scott *v.* The State.

Murder — Evidence. — See evidence held sufficient to sustain a conviction for murder in the first degree, with the death penalty affixed.

Appeal from the District Court of Lamar. Tried below before the Hon. R. R. Gaines.

The indictment charged the murder of Joe Spears in Lamar county, Texas, on the 11th day of January, 1881. The appellant was convicted of murder in the first degree, and his punishment was affixed at death.

Robert Chisum, the first witness introduced for the State, testified that he knew the deceased in his life-time; that the deceased was a butcher by trade when in life, and lived alone in a small shanty on the Greenville road, about one mile west of Paris, Texas. The shanty had a chimney on the north side, a dirt floor and a plank roof. The deceased was about fifty-eight years old. He owned, at the time of his death and at his place of residence, a pony, a wagon, some hogs and some chickens. He had a bed in his shanty, with a mattress and a few old quilts. About 2 o'clock in the morning of the 9th or 10th of January, 1881, the witness heard the report of a gun, and directly afterwards heard the deceased halloo. He went to the shanty to see him, and found him lying in the shanty before the fire, shot in the shoulder and side. He lived through the day the witness first saw him, and until four o'clock A. M. the next day, when he died. He had about eighty dollars in money about his bed. The

slaughter-pen at which the deceased worked was about one mile southwest of his shanty. Jack Hancock lived about a half-mile south of the slaughter-pen, and worked with the deceased. Nobody knew about the deceased's business. The witness found the money spoken of about the bed on the morning that the deceased was shot. The weather was cold, with some snow on the ground. The witness found tracks of persons in front and on the east and back of the house and also tracks leading west from the house. The deceased was, as usual, dressed in a very common garb.

On cross-examination the witness was shown a diagram of the premises, which he recognized. There was a door on the east side of the shanty, about the center of the wall. There were tracks of persons on both the east and west sides of the house. The witness saw one or two dead hogs in the pen of the deceased not a great while, perhaps two weeks, before the shooting, and was told by the deceased that some one killed or poisoned them. The deceased told the witness that he did not know who it was that shot him. He was lying in his bed in front of the fire when the witness found him. There were tracks of persons a few feet from the door, and all around about the door, but the witness could not tell from which side of the shanty the tracks came. Jack Hancock helped the deceased a great deal in his work, and other parties helped him occasionally.

On re-examination by the State, the witness stated that he lived about one hundred yards from where the deceased was killed, at Alex. Latimer's house. Jack Hancock was at Alex. Latimer's house the morning after the shooting.

George Woods testified for the State that he knew the defendant, and pointed him out in court. He said that the defendant looked like Isham Scott, whom he had often seen, though he did not look so well as when the witness last saw him. The witness lived in Grayson county in

January, 1881, and still lived there.   The defendant came to Lamar county from Grayson county in 1881, to buy pork, and returned to Grayson county in a few days. Shortly afterwards he left a second time and was gone a month.   He remained away so long that the witness and others, with whom he was to crop that year, despaired of his returning, and gave up some land they had leased for him to work.   When he returned, after being gone about one month, he said that he had been about Paris, that the people about Paris were generally very well, but that a man named Spears had been killed.   He also stated that he passed one night with Jack Bonner.   This was after his second absence, and after New Year's, 1881.   At New Year's the witness, defendant and others were together at the house of the witness's brother-in-law.

Cross-examined the witness stated that in January, 1881, he lived west of Sherman, in Grayson county, on Tom Patty's place.   He remembered having had a conversation with Mr. Bradley, one of counsel for the defense, in a certain room, on the day before this trial.   In that conversation the witness did not intend to say that the defendant had told him nothing about what he had done except to buy some meat, but, since the counsel so asserted, he presumed that he did say so.   The defendant married the daughter of the witness's wife.   The witness had no grudge against him for that marriage.   He did not approve of the marriage, but could not help or thwart it.

On re-examination the witness stated that he could not recall the day of the week or month on which the defendant first went away.   He was there around the neighborhood during Christmas, and left shortly after, remaining away a few days.   He returned, remained two or three days, and again left on horseback.   The witness could not tell the distance from Paris to Sherman.   He and the defendant had contracted to crop together that year, 1881. The witness harbored no prejudice against the defendant.

Daniel F. Latimer testified for the State that he knew the deceased in his life-time very well. Deceased butchered for a living and consequently dressed in a very common style. Jack Hancock worked with him more than any one else. Jack Hancock is also called Jack Bonner. The witness saw the deceased after he was shot. He was suffering a great deal and said that he would die. He told the witness that he heard his chickens squalling in the night, and, thinking owls were after them, he got up to run them off, when he was shot from behind. He again said that he would die, and told the witness that he had eighty or eighty-two dollars in money, and the witness asked him if old Jack knew that he had the money. The deceased said in reply that old Jack knew that he had some, but did not know how much. Old Jack Hancock was the only man whom the deceased said knew that he had the money,— the witness did not know it. The deceased had been butchering for Gray & Deal, a firm of butchers in Paris.

Robert Proctor testified for the State that he arrived at the house of the deceased near sunrise on the morning he was shot, and found the deceased lying on his bed in front of his fire place, wounded. Several persons were then present. He made a partial examination of the premises, and found the tracks of persons at the northeast corner of the shanty. At the same northeast corner he found some red paper which had been used for gun wadding. This paper was such as is used in covering canvassed hams. The witness gave this piece of paper to John H. Milsap, the sheriff of Lamar county. The deceased said in the presence of the witness that he was shot at the southeast corner of the shanty.

J. C. Hodges testified on behalf of the State that the deceased lived 250 or 300 yards from his house. A bois d'arc tree stood at the north end of the deceased's shanty, near the chimney, and had been a roosting place for

chickens. The witness examined the premises on the morning of the shooting, and found tracks of persons near the northeast corner, and others on the west side of the shanty. They appeared to be the tracks of two different persons, and from their appearance he judged that one of the parties had been standing there for some time. The witness also found the tracks of two persons indicating that they ran from where they stood in a southeast direction towards the house of Harry Carington. The tracks were made by different shaped boots or shoes, and were evidently the tracks of two different persons.

Dr. J. F. Hooks testified that he was a practicing physician, and that he saw the deceased a short time after he was shot. He examined him and found that he had been shot a little back of the right shoulder. The wound was made with duck or turkey shot, fired from a shotgun heavily charged. A number of the wounds thus inflicted were mortal, and the deceased died from their effects.

Jeff Bonner testified for the State that he was a son of Jack Bonner, sometimes called Jack Hancock. He had known the defendant for several years. He knew the deceased in his life-time. The witness's father had worked with the deceased in his butchering business. The witness remembered the night on which the deceased was shot, and stated that George Adams stayed all that night at his father's house, and the witness was of opinion that the defendant also passed that night at his father's house. While not positive that the night passed at his father's house by the defendant and Adams was the night of the killing, the witness was positive that they did pass a night there together about the time of the shooting. They were there when the witness lay down. George Adams and the witness slept in the same bed that night, Adams retiring first. Next morning when the witness got up, he found the defendant in bed

with Adams and himself. He did not know at what hour the defendant got in bed. There was a single-barreled shot-gun in the house that night, belonging to John Bonner, brother of the witness, and a supply of turkey shot. He did not know whether there was any red paper in the house or not, but thought that his mother had some paper patterns. The witness got up and left early the next morning, and did not know when the defendant left. John Bonner, witness's brother, was also at the house when the defendant and George Adams arrived, and was there next morning.

Cross-examined, the witness stated that he and Adams slept in the south room of the house, and that Adams had been in bed but a short time when he retired. He did not know whether Adams went out of the house that night- or not. The witness's father and mother slept in the north room. The witness saw the defendant when he got up next morning at daylight. He was not certain that this was the morning of the shooting, but believed that it was.

George Adams testified for the State that he knew the defendant, who was also called Pleas Scott. About the 10th day of January, 1881, the defendant came to the witness's house in Fannin county, Texas, and the two left together the same day, going to Paris. When they arrived at Paris that night they stopped at the house of Jack Hancock on Mr. Long's place, until morning. The witness had not previously known Hancock, but the defendant said that he and Hancock were good friends and that he was going there. This was the night on which it was said that the deceased was killed. While at this house he heard Jack Hancock tell the defendant that the deceased had a large amount of money; that he was butchering with him, and saw him with a roll of greenbacks as large as a man's fist. When this conversation took place between the defendant and Hancock they were standing

behind a corner of the house, and the witness behind the corner from them. The defendant said: "If we can get the money, by G—d, it is all right." Hancock and the defendant had been trying to trade for the witness's horse, and when he saw them talking, he slipped up near to hear them, believing they were trying to "put up a job" on him.

That night the defendant got and loaded a gun which was in the house. The witness did not see the paper, powder and caps, but he saw the defendant stoop down before the fire and pour some shot into one of his hands. The witness took it to be squirrel shot. After loading the gun the defendant and John Bonner went out, and the witness did not know when they returned. The defendant was in bed with the witness and Jeff Bonner the next morning when the witness got up. The next morning the witness went into Paris, and to a Mr. Speair's place on Main street. He left Paris early to return to his home in Fannin county, and *en route* overtook the defendant going west between Paris and Brookston. The defendant said: "Yes! by G—d, I killed Joe Spears." The witness went on with him to Joe Townsend's, and from there home. The defendant went on to Grayson county.

This witness stated, on cross-examination, that he lived about one mile from Savoy, in Fannin county, and that he had known the defendant some three or four years. He and the defendant got to Jack Hancock's on the night spoken of, about dusk. It was before Jeff Bonner and the witness went to bed that Hancock and the defendant talked about the deceased having money; but it was after dark; the witness did not know how long, but a half hour or perhaps an hour. There was a door in the south room of the house on the east side, and one in the north room on the west side. Hancock and defendant went out of the west door when they talked of the deceased having money, and the witness went out through the east door.

It was a cold night with some snow on the ground, and there was no moon then. The two stood on the west side of the house, and Hancock said that the deceased had a roll of greenbacks as big as a man's fist, and a sack of silver money. The defendant said: " All right, by G—d, I will go there and get it." The witness did not know how long they stood there. They did not see the witness. John and Jeff Bonner were about the house at the time. The witness and Jeff Bonner slept together that night in the south room, Jeff going to bed first, at which time Jeff's mother had not retired. Jack Hancock was in the house when John Bonner and the defendant had the gun. When the witness went to bed, Jack Hancock and the defendant came in and sat down by the fire. John Bonner was present, and it was then that the defendant got and loaded the gun. When he got the gun he said " By G—d, I am going after that money."

The witness stated that he testified in trials of Jack Hancock and John Bonner at the present term of the court, and he told Mr. Long, of counsel for the defense, that the defendant said at first that he was going hunting. As a fact, the defendant first said that he was going hunting, and afterwards said: " By G—d, I am going after old Joe Spears's money." The defendant loaded the gun in the house in front of the fire. The witness went to bed soon after the defendant and John Bonner left. The witness left Hancock's house soon next morning, and did not go back there. The defendant had sold the witness some meat and· they were going to Sulphur after it. At Hancock's house, next morning, he asked the defendant if he was going on with him after the meat, and he said that he was not, but gave no reason why, other than that he was going back to Grayson county. On his way home to Fannin county the witness overtook the defendant near some hog pens between Paris and Brookston, and traveled with him to Joe Townsend's, where they stayed

all night.   Between Paris and Brookston the defendant said: "Yes! by G—d, I did go after the money," and "yes, by G—d, I did kill old Joe Spears;" but the witness did not remember whether or not this was said in reply to anything said by him about the killing.   The witness had never told this in court before, but told Mr. Hodges, the prosecuting attorney, and Mr. Milsap, the sheriff, in the jail after the arrest of the defendant.

Jack Hancock lived on Mr. Long's place, south of Paris.   There was nobody at Joe Townsend's except the family when the witness and the defendant arrived there the night after the killing.   From Townsend's the witness and the defendant went to the witness's house in Fannin county, where the defendant stayed all night, going on next morning to his home in Grayson county. The witness went to Grayson county once afterwards to see the defendant, and then asked him about the killing of the deceased.   The defendant answered again: "Yes, by G—d, I did do it."   The witness accompanied the defendant but once to Paris, but did not remember the day of the month.   The witness knew John H. Milsap, the sheriff of Lamar county, and saw him in Fannin county.   Milsap said nothing to the witness about the defendant.   The witness did not hear the defendant say that he had a grudge against the deceased, or that he wanted to kill him for arresting him, the defendant. After the night at Hancock's the defendant and witness went to Sulphur after the meat the witness had purchased.   The defendant went down on the train to Brookston, and the witness went down on horseback. When the witness arrived he found the defendant and Jack Hancock there, and these two went on horseback to Tyson's and got the meat.

Joe Townsend testified for the State that in January, 1881, he lived on McBee's place in Lamar county.   During that month the defendant, who was in the habit of

stopping with the witness in passing, and George Adams came to his house and stayed all of one night. At the witness's house, near the wood pile, the defendant told the witness that the officers had Jack Hancock and John Bonner in jail for killing Joe Spears. The witness answered that he supposed it was all right, and the defendant answered: "Jack and John never killed him; I am the man that killed him."

On cross-examination the witness stated that he did not know of the arrest of Jack Hancock and John Bonner until informed by the defendant. There was no one present at the time. The witness knew the sheriff, Mr. Milsap, who came to his house inquiring after the defendant. The witness told the sheriff that the defendant had been at his house, but had gone home. The witness admitted that he may have told Milsap that he "did not know that nigger;" that Milsap answered, "Yes, you know you do," and that he then admitted to Milsap that he did know the defendant and said that he had been at the house but had gone. The defendant had been there and gone before Milsap came, but the witness could not say how long before. Adams and the defendant stayed together at the witness's house but once, and that was before the defendant told the witness that he had killed the deceased. The witness could not say how long before. The defendant told him of the arrest of Jack Hancock and John Bonner, and that it was he, defendant, who killed the deceased, after Milsap's visit to his house in search of the defendant.

John H. Milsap, sheriff of Lamar county, testified that Jack Hancock and John Bonner were put in jail, charged with the murder of the deceased, in January, 1881, and that the defendant was arrested in March.

Cross-examined the witness stated that he went to Joe Townsend's house about the 1st of March, and asked Townsend how long it was since the defendant had been

there. Townsend said that he did not know Isham Scott, and the witness told him that he was the negro who traded a horse with Scurlock. Townsend answered: "he goes by the name of Isham Cruise; oh! yes, sir, he's been here." The witness did not remember whether he took his horse back to Paris himself or sent him back and took the train, but at all events he went from Townsend's to Grayson county and arrested the defendant.

Re-examined the witness said that he saw some paper at Hancock's house that was like the wadding handed him by Proctor. He also saw two single-barrel shot-guns at Hancock's. Except the paper at Hancock's house, the witness found no paper which exactly matched the wadding spoken of.

Jeff Bonner was the first witness introduced for the defense. He testified that George Adams went to bed before he did on the night that he, Adams and defendant stayed at the house of the witness's father. The bed in which they slept was in the southeast corner of the south room, but was not jamb up against the wall. The witness's mother had gone to bed, and his father had laid down. The witness did not know whether or not Adams got out of bed during the night. He could not have done so without climbing out over the witness. The witness did not see the defendant and John Bonner go out of the house that night before he went to bed, nor did he hear any conversation in which the defendant said that he was going after Joe Spears's money, and did not see him get the gun; and the witness thought that if such proceeding had transpired he would have seen it. He knew nothing of Adams getting up and going to the fire. He, witness, would have heard the conversation about the money if it had taken place.

On cross-examination the witness said that when he went to bed, he went right off to sleep, and did not wake during the night that he remembers. The witness as-

.serted positively that Adams went to bed first and lay on the side next to the wall. When the witness awoke next morning, the defendant was in the same bed, occupying the front side, leaving him in the centre place. The defendant had spent other nights at the house of the witness's father.

Mr. Hodges, the county attorney, and Mr. Ulmer asked the witness at his father's house, about three weeks after the killing, if he knew the defendant, and the witness told them that he thought that the defendant stayed all night at his father's house on the night of the killing. He was not positive of this, however; but he did not tell them that the defendant did not stay there that 'night. The witness did not remember what he did testify to on the trial of Jack Hancock and John Bonner, but he did tell the county attorney then that George Adams stayed at his father's house all that night, and did say positively at that time that the defendant never did stay there. On the trials spoken of, the witness told the county attorney that the reason he said so was that his "father would never let him talk after any body." He did not tell the county attorney about the defendant staying at the house all night, because he "had been raised not to meddle with older folks." After a long time the witness acknowledged that the defendant stayed at the house. Said he had been questioned so much about it that he did not know what to say. He remembered that he denied that the defendant stayed there that night. He denied that he told the county attorney that his father was sick that night, and that they all sat up with him all night. He did say that his mother sat up with his father, and that the others sat up a little while. His mother rubbed his father's arm one night, but the witness could not say that it was the night that the defendant and Adams stayed there. The witness's father would have whipped him if he had told that defendant stayed there that night.

On re-examination the witness stated that he knew at the time that Mr. Hodges was the county attorney and that Mr. Ulmer was the city marshal of Paris, and that they frightened him when they talked to him.

On re-cross examination he said that his father was not in jail when Hodges and Ulmer talked to him. The interview occurred in the north room. The witness did not, when he entered the room without being asked, say, "Yes, daddy was here all night." The county attorney ordered him to take a seat and pull off his hat. When the witness was talking to Mr. Ulmer he saw him put his hand in his bosom.

Susan Bonner testified for the defense that she was called Susan Hancock, but that Susan Bonner was her right name. George Adams and the defendant stayed at her house all night together once, but she did not remember that it was the night of the killing. Her impression was that it was before the killing. They were there twice but came together but once. The night they stayed there Jack Hancock, and John and Jeff Bonner were at home. The witness did not know whether Jeff Bonner or George Adams went to bed first, but thought that both were in bed when she retired. When the witness went to bed she left the defendant sitting up and John Bonner preparing to go to bed. Jack Hancock was sick, and had laid down. She heard no conversation in which the defendant said that he was going after Joe Spears's money or that he was going hunting. She did not see the defendant take up a gun, though he might have done so after she went to sleep. She knew nothing of the defendant and Jack Hancock going out of the house and having a talk. She knew Messrs. Hodges and Ulmer. They came to the witness's house once together, and Mr. Ulmer came alone once. They came together just before the arrest of Jack Hancock, and asked about him. The witness did not remember that they asked much about

John Bonner.   She remembered nothing about their questioning Jeff Bonner.

Cross-examined, the witness said that Jack Hancock, when he returned home after moving Mr. Piper, told her that the deceased was killed the night before, and it was the night before he moved Piper that the defendant and Adams stayed all night.   The witness thought Jeff Bonner went to bed before Adams did on the night in question, but was not certain.   Jack Hancock laid down before the witness did that night.   The last she saw of the defendant and John Bonner that night they were sitting before the fire.   The witness did not wake up during the night until Jack Hancock got up to feed, and at that time both John Bonner and defendant were in bed.   She stated that she told Hodges and Ulmer that she woke up in the night and saw the defendant and John Bonner before the fire.   John Bonner was taking off his boots. The defendant and John Bonner were sitting by the fire. She remembered waking up once and seeing some of the party sitting up before the fire, but she did not know how long this was after she went to bed.   When she waked up the last time John Bonner was in bed in the north room and the defendant was in bed in the south room.   She did not know whether or not they left the house during the night.   The witness did not remember saying to the county attorney that "two niggers didn't stay there," or that "nobody stayed all night."   She did say to him that she rubbed Jack Hancock's arm that night, and that no one stayed there that night.   The reason of her denial was that she did not then know that anything had been done.   She said that Jack Hancock had been at home the night before.   He came back home that night and left the next morning.   He told the witness about going to Hodges's office.   Afterwards the witness acknowledged that the defendant was at her house during the night in question, because Ulmer told

her that if she did not confess, she would "go like Mr. Spears did." She remembered nothing of Mr. Milsap's visit to her house. She did not remember telling Milsap that when Jack Hancock came back from town he said that he heard a gun fire and Spears halloo. George Adams left the house on the morning of the killing before breakfast. Jeff Bonner is about twenty years old; he has had some foolish spells and is easily frightened.

Austin Pollard testified that he was of counsel for the defendant when, six months previous, the latter was tried for another offense. Adams was a witness for the State in that case and testified on the trial that he and the defendant went to George Tyson's on Sulphur for some meat in the first part of January, 1881,—just after Christmas, and about the 1st or 2d of January.

J. M. Long testified that he was counsel for Jack Hancock and John Bonner in their trials for this same offense. George Adams was a State's witness in those trials, and testified that when Isham Scott first got the gun at Hancock's he said that he was going hunting; that he then went to the door and said: "By G—d, I am going after old Spears's money;" followed this up by saying: "By G—d, I believe I will go and kill old Joe Spears."

No brief for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

Willson, J. In January, 1881, Joe Spears was assassinated in the night, at his home in Lamar county. He lived alone in a shanty about one mile from Paris, and followed the occupation of butcher. He was possessed at the time of some money, and this fact was known to Jack Hancock, who was in his employ and lived near to him. The defendant was indicted for the murder, and on the 16th day of May, 1882, was found guilty of the charge by a verdict of a jury, and his punishment assessed

at death. We have given the case that careful examination and consideration which its importance and its solemn consequences to the defendant demand. The indictment is in due form, and the evidence, consisting in part of the voluntary confessions of the defendant, satisfactorily and beyond any reasonable doubt establishes his guilt of the crime. The charge of the court is full and correct, applying the law to the facts lucidly and appropriately. We find no error in the proceedings and conviction. The defendant, in our opinion, has had a fair and impartial trial in accordance with the most rigid rules of the law. By his own deliberate and fiendish act he has forfeited his life, and the stern, but just mandate of the law must be enforced upon him. The judgment of the court below is affirmed.

*Affirmed.*